IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BERKLEY NATIONAL INSURANCE COMPANY , | ) | Case No. 1:22-cv-0795 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| v. | ) | |
| | ) | |
| THE LUBRIZOL CORPORATION, *et al.,* | ) | **<u>DISMISSAL ORDER</u>** |
| | ) | |
| Defendants. | ) | |

Berkley National Insurance Company ("Plaintiff" or "Berkley") filed this declaratory judgment action against The Lubrizol Corporation ("Lubrizol") and its affiliate SAS Lubrizol France (collectively with Lubrizol, "Defendants"). ECF Doc. 1.  Defendants answered the Complaint.  ECF Doc. 5 and ECF Doc. 8.  Upon review of the pleadings, the Court directed the parties to submit briefs addressing whether Berkley's claims are justiciable or premature.  ECF Doc. 11 and ECF Doc. 13.  For the reasons set forth below, the Court concludes that the case is not presently justiciable and is hereby DISMISSED without prejudice.

I.    **Facts**

On September 26, 2019, a fire occurred at a facility operated by Defendants in Rouen, France.  ECF Doc. 1 at ¶ 13.  Industrial chemicals burned, and smoke and soot spread approximately 22 kilometers.  *Id.* at ¶ 17.  Local agriculture, schools, and businesses suspended operations.  *Id.* at ¶¶ 15-18.

The French government initiated a civil investigatory proceeding to determine

Defendants' role, if any, in allegedly causing the fire.  ECF Doc. 11 at 4.  Two years later in September 2021, another civil investigation was initiated to determine whether runoff from extinguishing the fire caused water pollution.  *Id.*  Defendants were ordered by the French government to place €4 million in escrow as security in the event of liability.  *Id.* at 5.  To date, there has been no official determination regarding the cause of the fire or culpability for water pollution, and Defendants have not been found criminally or civilly liable in any French court. *Id.*

Various claimants in the surrounding region asserted that they suffered damages resulting from the fire.  ECF Doc. 1 at ¶¶ 21-23.  Defendants have made payouts on approximately 1,300 claims, while approximately 320 more remain unresolved.  *Id.* at ¶¶ 24, 30; ECF Doc. 5 at ¶ 19; ECF Doc. 11 at 5, 117; ECF Doc. 11-3 at ¶ 4.

Defendants carried liability insurance coverage issued by National Fire & Marine Insurance Company (the "National Fire Policy").  ECF Doc. 1 at ¶¶ 25-28.  The National Fire Policy provided coverage up to a specified limit for damage claims against Defendants, subject to the terms and conditions of a pollution-specific endorsement.  *Id.* at ¶ 28.

Defendants also carried an excess liability policy issued by Berkley, subject to its own pollution-specific endorsement.  *Id.* at ¶ 29.  In Berkley's view, its excess policy does not cover pollution damage claims arising from the fire or the payouts Defendants have been making to affected claimants.  *Id.* at ¶¶ 36-40.  Despite disavowing coverage in reservation of rights correspondence, Berkley further informed Defendants that – again, in Berkley's view – Berkley's consent would be required for any payout by Defendants that subsequently might be covered under the excess policy.  *Id.* at ¶ 43.  To Berkley, the failure to obtain consent might itself be an additional reason for non-coverage under the excess policy.  *Id.*

2

Both sides agree that Defendants have "not yet presented a formal claim to Berkley" under that policy.  ECF Doc. 1 at ¶ 35; ECF Doc. 5 at ¶ 29.  However, both sides also acknowledge "that the National Fire Policy is 'nearly exhausted' and that there are 'hundreds of claims yet to be resolved.'"  ECF Doc. 5 at ¶ 27; *see also* ECF Doc. 1 at ¶ 33.  Further, "Lubrizol admits that it is reasonably likely that the claims arising from the Fire will exhaust the limits of the National Fire Policy."  ECF Doc. 5 at ¶ 26; *see also* ECF Doc. 1 at ¶ 32.

Defendants have submitted demands for reimbursement under the National Fire Policy. ECF Doc. 12-1 at ¶¶ 3-4.  As of September 2022 (*i.e.,* three years since the fire), they requested and received from National Fire around $21.1 million in such reimbursements.  *Id.* at ¶ 5. Defendants' last request for reimbursement occurred on March 1, 2021.  *Id.* at ¶¶ 9-10.  Thus, approximately 84% of the National Fire Policy's $25 million coverage limit has been exhausted, and that figure has remained at 84% since March 1, 2021.  *Id.* at ¶ 11.

In this action, Berkley seeks contract construction of its excess policy to declare:

- whether pollution damage claims are covered by the pollution endorsement in the excess policy (Count I);

- whether certain civil proceedings in France constitute a "suit seeking damages" against Defendants that trigger Berkley's obligation to provide a defense (Count II);

- whether the excess policy requires Berkley to provide indemnity for certain damage to Defendants' own real property (Count III);

- whether the excess policy requires Berkley to provide indemnity for damage to Defendants' products (Count IV);

- whether the excess policy requires Berkley to provide indemnity for civil or criminal fines or penalties related to the fire (Count V); and

- whether Defendants' payments to claimants were voluntary and/or were made without Berkley's required consent, thereby excluding those from coverage under the excess policy (Count VI).

ECF Doc. 1 at ¶¶ 45-70; *see also* ECF Doc. 11 at 3.  No claim of any of these six types has yet been submitted to or demanded from Berkley.  ECF Doc. 1 at ¶ 35; *see also* ECF Doc. 5 at ¶ 29.

## II.     Law and Analysis

The Court begins with the pertinent legal doctrines, followed by a review of the parties' arguments regarding justiciability.  The Court then examines the pleadings, record, and legal arguments to determine whether Berkley has sustained a cognizable injury and whether this dispute is ripe for adjudication.

### A.  Requisites for Federal Subject-Matter Jurisdiction

"The Declaratory Judgment Act has, over the years, provided an extremely useful procedural device for adjudicating disputes concerning insurance."  *Allstate Ins. Co. v. Green*, 825 F.2d 1061, 1064 (6th Cir. 1987), *abrogation on other grounds recognized by Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964 (6th Cir. 2000).  Where an actual controversy exists, a district court "may" declare the rights of parties.  28 U.S.C. § 2201(a).  But there must be "an 'actual controversy' within the meaning of the Declaratory Judgment Act, . . . since the District Court is without power to grant declaratory relief unless such a controversy exists."  *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 272 (1941) (citation omitted); *see also Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("The existence of an 'actual controversy' in a constitutional sense is necessary to sustain jurisdiction under the Declaratory Judgment Act." (citation omitted)).  As the Sixth Circuit has held:

> Federal courts cannot issue advisory opinions.  Article III's case-or-controversy requirement allows federal courts to resolve concrete disputes, but prohibits them from passing judgments on theoretical disputes that may or may not materialize. The Supreme Court has delineated these limits with a number of justiciability doctrines, including standing and ripeness.

*Safety Specialty Ins. Co. v. Genesee Cnty. Bd. of Comm'rs*, 53 F.4th 1014, 1020 (6th Cir. 2022) (quotations and citations omitted).  "There is unquestionably some overlap between ripeness and

standing." *Airline Prof'ls. Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003).

### 1. Standing

> To have standing, plaintiffs must allege (1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress.  Plaintiffs must show an imminent or actual injury before [entering] the federal courts.  They cannot sue simply to avoid a possible future injury.  Suits based solely on the mere risk of future harm cannot establish an injury sufficient for standing.

*Safety Specialty*, 53 F.4th at 1020 (quotations and citations omitted).  "In the context of claims for . . . declaratory relief, the threatened injury in fact must be concrete and particularized, as well as *actual and imminent*, not conjectural or hypothetical."  *Sullivan v. Benningfield*, 920 F.3d 401, 407-08 (6th Cir. 2019) (emphasis added; citations and quotations omitted).  "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

"[I]it is possible that a plaintiff can have a cause of action – a legally recognized mechanism of obtaining a remedy – and yet no Article III standing to assert that cause of action in federal court."  *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1058 (6th Cir. 2022). "[W]hether the plaintiff suffered an injury in fact does not necessarily hinge upon the substantive requirements of any particular cause of action."  *Id.* at 1060.

### 2. Ripeness

"The ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances."  *Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir. 1985).  "The 'basic rationale' of the ripeness doctrine 'is to prevent the courts, through avoidance of premature adjudication, from entangling

5

themselves in abstract disagreements . . . until a[ ] . . . decision has been formalized and its

effects felt in a concrete way by the challenging parties.'" *Barber v. Charter Twp. of Springfield,*

*Mich.*, 31 F.4th 382, 388 (6th Cir. 2022) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136,

148-49 (1967)).

> [A] claim is not ripe if it turns on contingent future events that may not occur as
> anticipated, or indeed may not occur at all.  Ripeness separates those matters that
> are premature because the injury is speculative and may never occur from those
> that are appropriate for the court's review.  The Declaratory Judgment Act does
> not alter these rules[.]  * * *  When a party sues for declaratory relief, he must
> satisfy the prerequisites of the Declaratory Judgment Act and Article III's
> standing baseline.  In particular, he must show a substantial controversy, between
> parties having adverse legal interests, of sufficient immediacy and reality to
> warrant the issuance of a declaratory judgment.

*Safety Specialty*, 53 F.4th at 1020-21 (quotations and citations omitted).

### B.  The Parties' Contentions

#### 1.  Evidence

Berkley submitted two affidavits from its own attorneys to support its contention that this

matter is ripe for adjudication.  *See* ECF Doc. 11-2; ECF Doc. 11-3.  The Ryan Declaration

attached news articles and reports from Defendants' public websites regarding their actions to

resolve claims related to the fire.  *See* ECF Doc. 11-2.  The Fredette Declaration recounts that

Defendants' counsel provided information confirming that the National Fire Policy had a $25

million coverage limit, of which $3.9 million remains available.  ECF Doc. 11-3 at ¶ 3.

Approximately 320 claims related to the fire are still outstanding and unadjusted.  *Id.* at ¶ 4.

Defendants submitted an affidavit from an in-house paralegal confirming the $21.1

million figure and the $25 million limit.  ECF Doc. 12-1 at ¶ 5.  The Williamson affidavit points

out that coverage under the National Fire Policy is only 84% exhausted and has remained at that

figure since March 2021.  *Id.* at ¶¶ 9, 11.  Defendants do not deny the suggestion that 320

additional claims were submitted to them which remain outstanding.  *See id.*; *see also* ECF Doc.

12 at 2 (admitting "that there exist numerous additional open claims").)

### 2.  Arguments

Berkley argues that exhaustion of the National Fire Policy is a question of when, not if,

stating it is a "certainty that Lubrizol will request Berkley defend and indemnify it in relation to .

. . 'property damage' claims . . . as well as the separate civil and criminal proceedings . . . ."

ECF Doc. 11 at 2; *see also* ECF Doc. 1 at ¶ 35.

Defendants already adjusted and paid around 1,300 property damage claims, with 320

such claims unresolved.  ECF Doc. 11 at 8.  In addition to those, the civil and criminal

investigations by the French government remain open.  *Id.*  Those facts establish the "significant

possibility of future harm" sufficient to ripen the coverage questions under the excess policy,

Berkley contends.  *Id.* at 116 quoting *Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522,

527 (6th Cir. 1998).

Berkley argues that there is no need to await a tender of claim by Defendants under the

excess policy in light of Berkley's issuance of reservation of rights letters that disavow coverage

related to the fire.  ECF Doc. 13 at 2-3.  Because the Complaint focuses on contract construction

of the excess policy and questions of law, the matter is inherently ripe for adjudication, Berkey

argues.  *See id.* at 9.  And purported hardship would ensue if this action is not heard:

> Permitting the live dispute to fester without resolution until the inevitable, first
> dollar demand to Berkley will certainly impact Lubrizol's adjustment of the 320
> remaining claims, as well as activity in the various French proceedings.  Berkley
> will itself be placed in the position of deciding whether to decline payments and
> invite a breach of contract claim, and potentially other claims, or to pay sums it
> does not owe and then attempt to claw back that money through further litigation.

ECF Doc. 11 at 3.

Defendants point out that "the reimbursement process with National Fire has slowed to a

near standstill, evidencing that exhaustion of the National Fire policy limits is something far less

7

than 'imminent' and that this matter is not ripe."  ECF Doc. 12 at 2.

> As Berkley readily admits, no determination of fault has been made by any tribunal with respect to the incident and there can be no reasonable dispute that a determination that Lubrizol is not at fault might have a chilling effect on whether (or when) additional claims get paid.

> But that is all speculation; what is fact, however, is that Lubrizol has not submitted any demands for reimbursement for indemnity to National Fire since March 2021.  Accordingly, Berkley's insistence that exhaustion is "imminent" is based on unsourced speculation . . . .

*Id.* at 4.

Defendants distinguish the cases cited by Berkley on the ground that those were actions brought by insureds against insurers, which was tantamount to a demand that rendered the coverage disputes ripe.  *Id.* at 4-5. "Here, Lubrizol has not yet made any such declaration or planted such a stake.  It has not requested payment from Berkley and it is not ready to do so."  *Id.* at 5.  Defendants also warn that Berkley is soliciting an advisory opinion:

> By jumping the gun here, Berkley is seeking to put itself in the advantageous position of getting a Court's opinion on its potential arguments against coverage *before* it actually has to issue a coverage decision, thus giving it the ability (should it not like this Court's decision) to take a second bite at the apple and rely on different sections of the CEL policy for the actual coverage decision.

*Id.* at 5-6. (emphasis in original).

### C.  Whether Exhaustion of the National Fire Policy is Certain

Berkley argues that it is inevitable that the National Fire Policy will be exhausted. "Given the amount already paid, the 320 outstanding claims and pending civil and criminal proceedings involving Lubrizol, exhaustion is a certainty."  ECF Doc. 11 at 10; *see also* ECF Doc. 13 at 2-3, & 5.

On the present record and for the reasons discussed below, it remains possible that Defendants will at some point seek payment under the excess policies.  But there is no telling when, and it is by no means certain.

8

### 1.    Property Damage Claims

Berkley asserts that around 1,300 property damage claims already were adjusted and paid, exhausting $21.1 million of the National Fire Policy's $25 million in coverage.  *See* ECF Doc. 11 at 5 & 8; ECF Doc. 13 at 2.  Based on those figures, each property damage claim 'cost' around $16,230 (on average) to resolve.

If one assumed that the remaining 320 claims will result in a payout or other costs, and if one further assumed that all of those would cost the same average amount to resolve, then that would project another $5.2 million in future costs.  With only $3.9 million in coverage remaining under the National Fire Policy, exhaustion would occur *if* those assumptions actually were to unfold.

But that is conjecture.  It is not a demonstration that a concrete injury occurred or that a ripe dispute exists.  For example, it remains possible that the 320 claims (or some portion thereof) might not result in a payout.  It also remains possible that remaining claims may cost less to resolve.

A theory of justiciability "which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  "Standing is not 'an ingenious academic exercise in the conceivable.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566 (1992) (quoting *U.S. v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 688 (1973)).

The Fredette declaration points out that $21.1 million has been paid to Defendants under the National Fire Policy in relation to the fire.  ECF Doc. 11-3 at ¶ 3.  However, Fredette does *not* attest that $21.1 million was paid out to claimants.  Berkley thus has not provided the Court with a basis to presume that the $21.1 million paid under the National Fire Policy to date is a figure that can or should be extrapolated as to the 320 remaining property damage claims.

For now, 16% of the coverage under the National Fire Policy remains available.  That pool of remaining coverage has held since March 2021.  *See* ECF Doc. 12-1 at ¶ 11.  Until that money is gone, Defendants may not have a contractual right to request a dollar from Berkley under the excess policy.  In any event, to date, Defendants have not yet demanded (much less received) payment or reimbursement from Berkley.  The property damage claims therefore have not yet resulted in any redressable injury to Berkley.

Berkley has not shown that such an injury-in-fact is imminent.  Since March 2021, no additional claims were made by Defendants on the National Fire Policy.  *See id.*  Defendants therefore argue persuasively that the pace of using coverage has slowed to a crawl.  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative . . . . [T]hreatened injury must be *certainly impending* to constitute injury in fact, and . . . [a]llegations of *possible* future injury are not sufficient."  *Clapper*, 568 U.S. at 409 (emphasis in original) (quotations and citations omitted).  Exhaustion of the National Fire Policy remains for the time being a contingent future event that may not unfold as anticipated or may not occur at all.  *See Safety Specialty*, 53 F.4th at 1020.

In sum, the effect of the property damage claims does not give Berkley standing and does not result in a dispute that is ripe for adjudication.

### 2.  The Pending French Investigations

Berkley points to another reason to expect exhaustion: the French government's investigations remain open.  Apparently no decision has been made on Defendants' culpability for causing the fire, civil liability, or criminal liability.  *See* ECF Doc. 11 at 5.  The fire occurred

three years ago, and so this fact seems to cut both ways.[1]  For now, this Court cannot conclude that the open French government investigations render it certain that the National Fire Policy will be exhausted.

Berkley did not plead, nor does it contend on brief, that it is probable that Defendants will be found liable by the French government.  Berkley likewise does not argue that Defendants should be deemed culpable.  This agnostic position does not push Berkley's assertion of justiciability across the line from merely possible to plausible.  *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").  At this juncture and on this record, the Court cannot draw a reasonable inference of Defendants' impending civil or criminal liability in France.  *See Whitmore v. Arkansas*, 495 U.S. 149, 159-60 (1990) (holding that plaintiff lacked standing for lack of a "real and immediate" injury and reasoning that "guilty verdicts are returned after only some trials.  It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case").

In sum, the absence of decision(s) in the French investigations does not give Berkley standing nor does it render Berkley's requests for coverage determinations ripe for adjudication.

---

[1] If the French government closes the investigations and elects not to pursue them further, or finds that someone or something other than Defendants caused the fire, or concludes that Defendants are not liable for some doctrinal reason under French law, then any of those outcomes would cut against Berkley's presumption that the National Fire Policy would exhaust.  The €4 million escrow posted by Defendants would be released in this scenario, and it would not be a sum for which they seek reimbursement from insurers.  *See* ECF Doc. 12 at 4, n.4.

### D.  Whether There is Hardship

Given that Berkley has neither assumed any defense nor paid any claims or requests for reimbursement on the excess policy, it is difficult to conceive of any hardship it suffers.  *See generally Amelkin v. McClure*, 74 F.3d 1240 (6th Cir. 1996) ("The question of hardship typically turns upon whether the challenged action creates 'a direct and immediate' dilemma for the parties.") (citing *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 496 (1st Cir. 1992)).

Yet Plaintiff argues:

> Permitting the live dispute to fester without resolution until the inevitable, first dollar demand to Berkley will certainly impact Lubrizol's adjustment of the 320 remaining claims, as well as activity in the various French proceedings.  Berkley will itself be placed in the position of deciding whether to decline payments and invite a breach of contract claim, and potentially other claims, or to pay sums it does not owe and then attempt to claw back that money through further litigation. It is these tangible hardships that Berkley wishes to head off . . . .

ECF Doc. 11 at 3.

> While Berkley has no obligation to Lubrizol in relation to the Rouen Fire, it is precisely this unfortunate scenario Berkley wants to prevent.  Further, if Berkley elects to make payments it does not owe, the hardship is even starker.  Berkley will be faced with the potential payment of millions of dollars and a lengthy process of litigation in order to retrieve significant sums it had no obligation to pay in the first place.

*Id.* at 12.  "Once the National Fire Policy exhausts, Berkley will be faced with the decision to deny coverage or make payments and pursue post-payment relief.  Significant hardship will result in either case."  ECF Doc. 13 at 10.

First, the dilemma Berkley describes is a future problem, not a present one.  That is because to date Berkley has not been asked – and itself has not volunteered – to pay sums under the excess policy.  Fear of future hardship is not the same as actual, existing hardship.  *See Clapper*, 568 U.S. at 416 (holding that a plaintiff may not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not

certainly impending"); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020)

("fear of a future harm is not an injury in fact unless the future harm is 'certainly impending'"

(citing *Clapper*, 568 U.S. at 410)).

Second, the decision Berkley will face is not a genuine hardship.  If it receives a claim for

payment under the excess policy, Berkley will face the decision of whether to refuse it or to pay.

If it pays, Berkley may do so subject to a reservation of rights and then litigate the coverage

question.  There remains a right to claw back money if coverage litigation is resolved in

Berkley's favor.  That is the precise lesson in the cases Berkley cites where courts indicated that

an insurer should provide a defense for a disputed claim and file a declaratory action to vindicate

its belief that no coverage is owed.  *See* ECF Doc. 13 at 7-9 (collecting authorities).)

Anticipating a future choice is not enough to have standing under Article III.  *See Buchholz*, 946

F.3d at 865.

> [Plaintiff] has not alleged that he refuses to pay what [defendant] says he owes.
> Rather, [plaintiff] fears what might happen *if* he does not pay.  So far as we know,
> [plaintiff] might decide to pay his debts, warding off any prospect of litigation.
> Because [plaintiff] has neither alleged that [defendant] has threatened to sue him
> nor that he refuses to pay his debts, we cannot infer that litigation is 'certainly
> impending.'

*Id*. (emphasis in original),

Berkley relies on its own reservation-of-rights letters (where it disavowed coverage under

the excess policy) to render the coverage questions seemingly ripe and concrete.  *Buchholz*

teaches that neither (i) Defendants notifying their insurers about the fire and the possibility of

future claims, nor (ii) Berkley's own legal letters or concerns about future coverage disputes will

suffice to constitute a justiciable controversy.  *See Buchholz*, 946 F.3d at 864-66; *see also*

*Summers v. Earth Island Inst*., 555 U.S. 488, 496 (2009) (holding that a plaintiff may not

manufacture standing by relying on conjecture or what he intends to do in the future).

13

Because no claim or demand for payment under the excess policy has been made (at least thus far), Berkley does not face a direct and immediate dilemma that would suffice to constitute an injury-in-fact or to render the insurance coverage questions in the Complaint ripe for adjudication.

### E.  Development of the Factual Record

Berkley argues that "cases turning on 'purely legal' questions are generally ripe for review." ECF Doc. 11 at 10; ECF Doc. 13 at 9.  It further suggests that development of the record will be straightforward because the six claims all turn on the interpretation of the excess policy.  *See id.*

### 1.    Pure Question of Law Cases

The decisions Berkley relies upon are inapposite.  *Thomas v. Union Carbide Agr. Prod. Co.* arose from a federal statutory requirement that "[a]s a precondition for registration of a pesticide, manufacturers must submit research data to the Environmental Protection Agency (EPA) concerning the product's health, safety, and environmental effects."  473 U.S. 568, 571 (1985).  The challengers to that statute each had submitted data to the EPA for their products. They challenged the constitutionality of the statutory mechanism on the ground that it amounted to the vesting of judicial power in an Article I agency.  *Id.* at 575-76.  The Supreme Court held that "it is sufficient for purposes of a claim under Article III challenging a tribunal's jurisdiction that the claimant demonstrate it has been or *inevitably* will be subjected to an exercise of such unconstitutional jurisdiction."  *Id.* at 580 (emphasis added).

In *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, utilities challenged a California statute which conditioned the construction of nuclear power plants on findings by a state agency that adequate storage facilities and means of disposal were available. 461 U.S. 190 (1983).  The lawsuit addressed whether federal law regarding nuclear energy

preempted California's law.  *Id.* at 194.

Berkley is correct to characterize such cases as 'purely legal' because they involved interplay and clash *between laws*:  federal and state, constitutional and statutory.  Here, by contrast, the excess policy will not be applied against some other law.  Interpretation of an insurance policy does not present a question of law akin to the constitutional jurisdictional challenge in *Thomas*.  Rather, the scope of the excess policy will be tested against fact-laden fire-damage and pollution-damage claims.  This Court also may be asked to look behind French government decisions in order to gauge excess coverage.

Those cases could be deemed ripe because the two necessary competing ingredients for adjudication were already realized.  In *Thomas*, the Constitution and the statute creating the EPA rules were both enacted law.  The same is true of the federal and state statutes in the *Pacific Gas* preemption case.  Here we have only one half of the ingredients necessary to adjudicate.  The excess coverage policies are available to be interpreted.  But there is not yet a claim or reimbursement expense against which to apply the policy's terms.

In *Thomas* and *Pacific Gas*, the plaintiffs could not conduct their business (selling pesticides and providing power) without first complying with the statute.  Those cases were ripe because the plaintiffs were either in the midst of, or about to comply with, regulatory preconditions.  Here, Berkley has not been prevented from conducting its business.  It issued reservation of rights letters to Defendants, staking out its position.  So far, it has not supplied a defense or paid on any claim or reimbursement arising from the Rouen fire.  Berkley has not (at least yet) sustained a redressable injury in fact as had the plaintiffs in *Thomas* and *Pacific Gas*.

### 2.  Fact Issues in Berkley's Claims

The factual terrain is different for each of the six claims in Berkley's Complaint.  Count I involves pollution-related claims, which may include local property and the water supply.

15

Counts I and II flow from third-party damages.  By contrast, Counts III and IV involve

Defendants' own property.  Counts I and II consider the smoke and pollution resulting from the

fire and firefighting efforts.  By contrast, Counts III and IV deal with direct effects of the fire.

Whereas Count III grapples with Defendants' real property and physical facilities, Count IV

covers a fundamentally distinct question of coverage for damage to the inventory of products for

sale.  The indemnity obligation covered in Count V will diverge into distinct questions for civil

*versus* criminal investigations.  Those investigations broach different subjects, *e.g.*, who was

responsible for causing the fire *versus* whether runoff water from firefighting polluted the water

table.  While policy construction is generally a question of law, a litany of facts must be

ascertained in order to frame the question here.  Finally, Count VI may prove fact-dependent.

Berkley suggests that Defendants are paying claimants 'voluntarily,' which may require the

Court to make findings about what precipitated Defendants' decision to resolve claims and/or

National Fire's decision to supply coverage.  Fact questions may be necessary in order to

determine if or how the excess policy applies.

### F.  Lack of a Justiciable Controversy

In the insurance context, the Sixth Circuit has explained:

> The test for determining the "case or controversy" and "actual controversy" issues
> is whether the facts alleged, under all the circumstances, show that there is a
> substantial controversy, between parties having adverse legal interests, of
> sufficient immediacy and reality to warrant the issuance of a declaratory
> judgment.  Stated differently, [a] controversy, to be justiciable, must be such that
> it can presently be litigated and decided and not hypothetical, conjectural,
> conditional or based upon the possibility of a factual situation that may never
> develop.

*Hillard v. First Fin. Ins*., 968 F.2d 1214 (6th Cir. 1992) (citation and quotation omitted).  Federal

courts have declined declaratory relief as to insurance coverage when predicated on a factual

contingency that might never occur.  *E.g., Stevenson v. W. & S. Mut. Holding Co*., No. 1:11-CV-

16

01354, 2012 WL 1035726, at *4 (N.D. Ohio Mar. 27, 2012); *Range v. Cincinnati Life Ins. Co*.,

No. 1:11-CV-1367, 2012 WL 1035728, at *4 (N.D. Ohio Mar. 27, 2012).

Berkley relies on *Safety Nat. Cas. Corp. v. Am. Special Risk Ins. Co.*, 99 F. App'x 41, 43

(6th Cir. 2004). ECF Doc. 11 at 7.  The plaintiff there was an excess coverage carrier. *Id.* at 42.

But the federal lawsuit itself was not to determine coverage; rather, it was to compel arbitration

pursuant to a settlement agreement. *See Safety National*, 99 F. App'x at 42.  Notably, the Sixth

Circuit affirmed the district court's dismissal of the excess carrier's case as unripe. *Id.* at 43 n.1.

Though the type of action and outcome in *Safety National* are inapposite, Berkley focuses

on the three recited reasons why the action to compel arbitration was not ripe.  The Sixth Circuit

pointed out that (i) the claim at issue was stayed, (ii) the claim would not likely exceed the

insurance limit, and (iii) there were no other additional claimants. *Id.* at 43.  Berkley is correct

that none of the features that rendered the suit in *Safety National* unripe are present here.

However, *the absence* of those features does not render this case justiciable.

Berkley cites *GenCorp Inc. v. AIU Ins. Co.*, 138 F. App'x 732 (6th Cir. 2005) for the

proposition that if a claim is likely to exhaust a primary policy, there may be ripe claims as to

multiple excess carries. ECF Doc. 13 at 10.  But *GenCorp*. involved an insured's settlement with

the primary insurer, which had ripple effects on the insured's rights to tap into excess policies.

138 F. App'x at 733.  *GenCorp*. does not grapple with standing, cognizable injury-in-fact, or

ripeness.

Berkley cites *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 652 (6th

Cir. 2013) for the proposition that the Sixth Circuit does not want insurers to deny coverage and

wait to be sued by an insured. ECF Doc. 13 at 11.  But what the Sixth Circuit prescribed differs

from Berkley's characterization: "When coverage is reasonably in dispute, the preferred course

of conduct for an insurance company is what occurred in the present case: (1) a defense of its insured's underlying personal injury action under a reservation of rights; and (2) a separate declaratory action adjudicating the issue of coverage."  *Philadelphia Indem.*, 732 F.3d at 652.

In that scenario, the insurer seeking declaratory relief had already sustained a redressable injury by paying defense costs for a matter arguably not covered by its policy.  Here, Berkley has not received a demand for reimbursement and has not paid out a dollar under the excess policy on claims or defense costs resulting from the French fire.  Berkley lacks the standing and ripe claim possessed by the hypothetical insurer described in *Philadelphia Indemnity*'s "preferred course" language.

*Raytheon Co. v. Cont'l Cas. Co*., 123 F. Supp. 2d 22 (D. Mass. 2000) also is unavailing. ECF Doc. 11 at 9; ECF Doc. 13 at 5.  There, the same insurance company issued both the underlying general policy and the excess coverage policy.  *Raytheon*, 123 F. Supp. 2d at 24.  The insurer agreed to (and actually did) pay some costs of the defense of claims against the insured – albeit under a reservation rights letter.  *Id.* at 25.  So in *Raytheon* a redressable injury in fact was present and was ripe for adjudication, inasmuch as the carrier claimed that those dollars should be repaid by the insured.  Notably, the court's discussion of the ripeness of declaratory relief as to the excess policy claims in *Raytheon* was expressly grounded in Massachusetts law regarding that state's declaratory judgment statute.  *See id*. at 30.  That explains why the ripeness discussion in *Raytheon* came in the context of a Rule 12(b)(6) motion – not a Rule 12(b)(1) motion.

> [A] true Article III ripeness analysis – whether the asserted injury is sufficiently imminent to warrant judicial intervention – and a Rule 12(b)(6) analysis – whether [plaintiff] had plausibly pleaded the essential elements of his claims . . . are distinct inquiries.  The former concerns whether the district court had Article III *jurisdiction* over the suit, while the latter concerns whether [plaintiff's] complaint fails *on the merits*.

*Charlton-Perkins*, 35 F.4th at 1057-58 (6th Cir. 2022) (emphasis in original).  A challenge to the jurisdiction of the federal court thus appears not to have been considered in *Raytheon*.

For all the reasons discussed above, this Court concludes that the present case is nonjusticiable.  Berkley has not yet sustained an injury in fact, and its potential dispute with Defendants is as yet unripe.  This Court therefore does not have subject-matter jurisdiction.

### III.    Conclusion

For the reasons discussed above, this Court dismisses this action without prejudice pursuant to Rule 12(b)(1).

IT IS SO ORDERED.

Dated: January 18, 2023                    *s/Dan Aaron Polster*
                                                         United States District Judge